STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                            FOURTH JUDICIAL DISTRICT
                                       CASE TYPE: CONTRACT & OTHER CIVIL

---

MBIA INSURANCE CORPORATION

               Plaintiffs,                          Civil File No. _____

       v.                                          **COMPLAINT**

ALLY FINANCIAL INC. (f/k/a GMAC,                  **(Jury Trial Demanded)**
LLC), IB FINANCE HOLDING COMPANY,
LLC, ALLY BANK CORP. (f/k/a GMAC
BANK), ALLY SECURITIES, LLC (f/k/a
RESIDENTIAL FUNDING SECURITIES,
LLC) and GMAC MORTGAGE GROUP,
LLC

              Defendants.

---

      Plaintiff MBIA Insurance Corporation ("MBIA"), for its Complaint against

defendants Ally Financial, Inc. ("Ally Financial"),[1] IB Finance Holding Company LLC ("IB

Finance"), Ally Bank Corp. ("Ally Bank"),[2] Ally Securities, LLC ("Ally Securities"),[3] and

GMAC Mortgage Group, LLC (collectively, the "Defendants"), alleges the following:

---

[1]  Ally Financial, Inc. was known during the relevant time period as GMAC, LLC.  For purposes of this
Complaint, all references related to either entity will be to Ally Financial.

[2]  Ally Bank was known during the relevant time period as either GMAC Bank or GMAC Automotive
Bank.  For purposes of this Complaint, all references related to any of these entities will be to Ally Bank.

[3]  Ally Securities was known during the relevant time period as GMAC-RFC Securities.  For purposes of
this Complaint, all references related to either entity will be to Ally Securities.

DOCS-#3759278-v2

## NATURE OF THE ACTION

1.      In this action, MBIA seeks to recover all losses that it has suffered arising from financial guaranty insurance policies (the "Policies") that Defendants and their affiliates fraudulently induced MBIA to issue in 2006 and 2007 in connection with seven residential mortgage-backed securitizations (the "Securitizations") sponsored by Residential Funding Company LLC ("RFC") and GMAC Mortgage LLC ("GMAC Mortgage," and together with RFC, the "Securitization Sponsors").

2.      Beginning in late 2007, MBIA learned that the mortgage loans underlying the Securitizations it had insured were performing unusually poorly, triggering MBIA's obligation to make payments for the benefit of investors in the Securitizations under the Policies. MBIA concluded that many of the mortgage loans underlying the Securitizations should not have been included in the transactions because their quality had been misrepresented. These loans appeared to breach representations and warranties that the Securitization Sponsors had made to MBIA to induce MBIA to issue the Policies. In accordance with the relevant transaction documents, including the insurance agreements (collectively, the "Insurance Agreements") that MBIA entered into with the Securitization Sponsors, MBIA sought to exercise one of the remedies provided by the agreements—the repurchase or "put back" remedy, which allowed MBIA to notify the Securitization Sponsors of the breaches and demand that they repurchase defective mortgage loans.

3.      Upon further investigation, it became apparent that the Securitization Sponsors had perpetrated a fraud on MBIA by making numerous misrepresentations to MBIA, including misrepresentations regarding the quality of the mortgage loans included in the Securitizations and the underwriting evaluation processes the Securitization Sponsors had used

2

to acquire the securitized mortgage loans. Among other things, the Securitization Sponsors falsely represented to MBIA that the tens of thousands of mortgage loans in the Securitizations were, in the case of RFC, underwritten to the criteria and underwriting standards as represented to MBIA, and, in the case of GMAC Mortgage, were representative of loans originated under the sponsor's loan programs.

    4.  The Securitization Sponsors did not act by themselves. As set forth in detail below, the Securitization Sponsors were aided and abetted in their unlawful scheme by Defendants through the integrated Ally business operation.

    (a)  Defendant Ally Financial is the ultimate corporate parent of all other Defendants in this action and controls the policy of the Ally business operation. In this capacity, Ally Financial pursued the Securitizations at issue through its indirect, wholly-owned subsidiaries the GMAC Mortgage and RFC, the Securitization Sponsors, in order to generate unlawful profits and fees for Ally Financial at the expense of MBIA.

    (b)  The Securitization Sponsors are both directly owned by ResCap, which also assisted the Securitizations Sponsors' efforts to defraud MBIA. ResCap is in turn the sole asset of defendant GMAC Mortgage Group, LLC, which in turn is directly owned by Ally Financial. Each Securitization Sponsor, GMAC Mortgage and RFC, is a defendant in separate actions filed in New York State court, and Ally Financial has placed both into bankruptcy along with their immediate parent, ResCap.

    (c)  In addition to the general financial, managerial, and policy assistance provided by Ally Financial, other Defendants provided direct assistance to the Securitization Sponsors through participation in the fraudulent securitizations. Defendant Ally Securities, a non-bankrupt subsidiary of Ally Financial, was directly involved in the Securitizations by

3

providing underwriting services. Finally, defendant Ally Bank was directly involved in the Securitizations by providing custodial services, and by assisting in the origination and acquisition of the defective loans included in the securitizations. Defendant Ally Bank is a non-bankrupt entity and is the sole asset of the bank holding company defendant IB Finance, which is in turn owned by Ally Financial.

5. Ally Financial's residential real estate finance business was conducted primarily through ResCap and the Securitization Sponsors, which originated, purchased, sold, securitized, serviced, and financed billions of dollars' worth of residential mortgage loans under various "brand" names, including RFC, GMAC Mortgage, ResCap, defendant Ally Bank, and defendant Ally Securities. At all relevant times, Defendants knowingly aided and abetted the fraudulent misconduct perpetrated by the Securitization Sponsors, including:

(a) The Securitization Sponsors knowingly disregarded their own loan program criteria and underwriting standards in connection with acquiring mortgage loans that were used to feed the Defendants' securitization machine to perpetrate a fraud to induce MBIA to issue financial guarantee insurance for the Securitizations.

(b) Despite express representations and warranties to the contrary made by the Securitization Sponsors to MBIA, the Defendants knowingly aided and abetted the Securitization Sponsors' acquisition, origination, and securitization of tens of thousands of mortgage loans that, in the case of RFC, were not underwritten in substantial compliance with its program criteria or underwriting standards, and in the case of GMAC Mortgage, were not representative of loans originated under its program.

(c) Prior to each Securitization, the Securitization Sponsors provided MBIA with materially false information concerning mortgage loans by means of loan tapes,

4

offering documents, and shadow ratings that the sponsors procured from the rating agencies. At the same time, the Securitization Sponsors provided MBIA with false assurances concerning the quality of the underlying loans and the Securitization Sponsors' business practices. Defendants knowingly aided and abetted the Securitization Sponsors' scheme to fraudulently induce MBIA into providing insurance for the Securitizations.

(d)     The Securitization Sponsors knowingly securitized thousands of mortgage loans that, at the time they were securitized, were falsely represented to MBIA. Many of these loans were originated by defendant Ally Bank or by another affiliate of Defendants, non-party Homecomings Financial Network, LLC, f/k/a Homecomings Financial Network, Inc. ("Homecomings").

(e)     Through Ally Bank, Defendants knowingly used deposits to finance the origination of defective mortgage loans by third-party originators for sale to, and securitization by, the Securitization Sponsors, including the same defective mortgage loans that the Securitization Sponsors improperly included in the Securitizations as part of the unlawful scheme alleged herein.

(f)     Through Ally Bank, Defendants knowingly originated and acquired defective mortgage loans that were purchased by the Securitization Sponsors and improperly included in the Securitizations as part of their unlawful scheme.

(g)     Through Ally Securities, as an underwriter of the Securitizations, as well as through the Securitization Sponsors, Defendants participated in the drafting and review of prospectuses and prospectus supplements (collectively, the "Prospectuses") to market securities to investors—and to mislead MBIA—knowing that the offering documents were replete with material misinformation concerning, among other things, the

5

Securitization Sponsors' loan underwriting and acquisition practices and the characteristics of the mortgage loans underlying the Securitizations.

(h)    Ally Financial, meanwhile, directed and controlled the operations of its above-mentioned subsidiaries.   Numerous officers, directors, and employees of Defendants were involved in the day-to-day business activities of ResCap and the Securitization Sponsors, including Ally Financial's Chief Executive Officer and Chief Financial Officer.   Furthermore, Ally Financial was responsible for auditing ResCap's and the Securitization Sponsors' loan acquisition, distribution, servicing, and underwriting processes and procedures through the use of its business unit GM Audit Services.  Indeed, ResCap's Chief Financial Officer recently conceded that "the mortgage loan origination, servicing and related securitization operation of [Ally Financial] are an integrated business involving the Debtors and Ally Bank."

6.    Despite knowing about the foregoing misconduct, Defendants, ResCap, and the Securitization Sponsors continued to finance, support, and facilitate their unlawful securitization scheme.  All of the Defendants, as well as ResCap and the Securitization Sponsors, were motivated to participate in the scheme and to promote its continuance.

7.    Defendants, through Ally Bank, profited from extending warehouse financing to the originators of non-compliant mortgage loans.  The fraudulent securitization scheme allowed Ally Bank and its then-owners, defendant Ally Financial and ResCap, to obtain cash flow from interest paid by third-party originators.  The originators needed to sell mortgage loans to the Securitization Sponsors to repay their obligations to Ally Bank.  Ally Bank also was responsible for originating and acquiring mortgage loans itself, which it then sold to GMAC Mortgage to include in the Securitizations.  Indeed, over 80% of the mortgage loans in the

6

GMAC Securitizations were originated or acquired by Ally Bank. Because of Ally Bank's lucrative financing, origination, and acquisition practice, Defendants had an incentive to continue to allow the Securitization Sponsors to buy mortgage loans from originators and Ally Bank without regard for the Securitization Sponsors' Loan program criteria and underwriting standards.

8.      Further, Ally Bank entered into contracts whereby it agreed to serve as the custodian for the GMAC Mortgage Securitizations, a role for which it collected substantial fees and allowed the Securitization Sponsors to continue their loan origination business. As alleged below, Ally Bank subsequently materially breached these contracts to the detriment of MBIA.

9.      Defendants, ResCap, and the Securitization Sponsors did not want to keep these non-compliant risky mortgage loans in the Securitization Sponsors' inventory because if and when such loans defaulted, the defaults would impair the value of the Securitization Sponsors' and Defendants' balance sheets. By off-loading the non-compliant risky mortgage loans through securitizations, Defendants, ResCap, and the Securitization Sponsors improperly shifted the risk of loss to investors and other parties. For these Securitizations, the risk was shifted to MBIA. This allowed Defendants, ResCap, and the Securitization Sponsors to maximize their profits, through their practice of acquiring and originating any loan—even non-compliant loans—knowing that any risk would be shifted to third parties such as MBIA.

10.     To prevent the truth about the Securitization Sponsors' mortgage loan inventory and underwriting practices from being discovered, the Defendants relied on Ally Securities, an affiliate, to underwrite and market the securities to be issued in connection with the Securitizations. As a securities underwriter and an affiliate of the Securitization Sponsors, Ally Securities had knowledge of the fraudulent scheme and practices being employed. Ally

Securities was motivated to continue and conceal the scheme so that it could continue to collect lucrative securities underwriting fees and build the value of its brand.  The Securitization Sponsors further profited from the scheme through profits generated from ResCap's servicing business.

         11.    In or around 2008, the Defendants' fraudulent scheme began to unravel. Starting in January 2008 as a result of concern about high delinquencies in the Securitizations, MBIA began reviews of certain loans included in the Securitizations.  These reviews uncovered widespread misrepresentations made to MBIA about the quality and character of the mortgage loans and the underwriting processes used in their origination and acquisition.  As a result, MBIA filed suit against RFC in October 2008 and against GMAC Mortgage in April 2010.  On or about May 14, 2012, just days after MBIA served its expert reports in the RFC Action detailing RFC's role in the fraudulent scheme, ResCap and the Securitization Sponsors filed for bankruptcy protection.  Doing so, however, did not change the fact that Defendants knowingly provided substantial assistance to the Securitization Sponsors in connection with the fraud perpetrated against MBIA, a fraud that has resulted in losses to MBIA in excess of $2 billion. The Defendants in this action have not filed for bankruptcy protection.  Through this action, MBIA seeks to recover those losses.

**PARTIES AND RELEVANT NON-PARTIES**

A.    **Plaintiff MBIA**

         12.    Plaintiff MBIA is a New York stock insurance corporation with its principal place of business in Armonk, New York.  During the relevant period, MBIA provided financial guaranty insurance policies in connection with securitizations involving residential mortgage loans, including prime home equity mortgage loans such as closed-end seconds

8

("CES") and home equity lines of credit ("HELOC"). As a financial guaranty insurer, based on the transaction structure and subject to the terms and conditions of the relevant policy, MBIA, in consideration of a premium, unconditionally and irrevocably guaranteed it would ensure that certain payments would be made to the trusts created in connection with the insured securitizations for the benefit of investors.

**B.**     **The Defendants**

        **1.**     **Defendant Ally Financial**

        13.     Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial is registered with the Minnesota Secretary of State. Ally Financial's primary business units consist of automotive financing, residential mortgage financing and servicing, and insurance services. Ally Financial is the ultimate parent company of all other Defendants in this action.

        14.     Defendant Ally Financial established a series of holding companies designed to hold certain of its business units. In particular, Ally Financial created defendant GMAC Mortgage Group, LLC, a Delaware limited liability company that is a direct wholly-owned subsidiary of Ally Financial and the direct parent of non-party ResCap. Ally Financial created GMAC Mortgage Group, LLC as a holding company to hold ResCap. GMAC Mortgage Group, LLC served no other purpose. It was merely an alter ego of Ally Financial. Defendant Ally Financial controlled and profited from ResCap through its control over GMAC Mortgage Group, LLC. GMAC Mortgage Group, LLC is registered with the Minnesota Secretary of State. Given the relationship between defendants GMAC Mortgage Group and Ally Financial, the two Defendants are referred to herein collectively as "Ally Financial."

9

15.    On November 30, 2006, FIM Holdings LLC ("Cerberus") acquired a 51%
interest in defendant Ally Financial for approximately $7.4 billion (the "Cerberus Acquisition").
Following the Cerberus Acquisition, defendant Ally Financial installed (and has continued to
control) new management in ResCap, including Jim Jones, James Redmond, Michael Rizzo, Eric
Scholtz, Luke Hayden, and Ed Kalush.

### 2.    Defendant Ally Bank

16.    Defendant Ally Bank is a chartered commercial state non-member bank
under the laws of Utah, which uses deposits collected from bank customers to make loans to
others. Ally Bank is registered with the Minnesota Secretary of State. Ally Bank was founded
in 2001 under the name GMAC Automotive Bank. Ally Financial rebranded GMAC
Automotive Bank in November 2006 as GMAC Bank, and ultimately changed the name to Ally
Bank in May 2009. At all times relevant to this Complaint, Ally Bank has provided, among
other things, retail banking services, warehouse financing for residential mortgage loan
origination and sales, automotive financing, and origination and acquisition of residential
mortgage loans. During the period of time relevant to this Complaint, the mortgage division of
Ally Bank was being operated by ResCap's "GMAC Residential Group." Additionally, during
the time relevant to this Complaint, Ally Bank served as custodian for Securitizations entered
into by GMAC.

17.    Defendant Ally Bank operates as a direct wholly-owned subsidiary of
defendant IB Finance. Defendant IB Finance is a Delaware limited liability company, created in
or around November 2006 in connection with Ally Financial's restructuring of Ally Bank. IB
Finance has been designated by Ally Financial as a holding company and is currently registered
with the United States Federal Reserve as a bank holding company. IB Finance is a direct

10

wholly-owned subsidiary of Ally Financial and the direct parent of Ally Bank.  Because Ally

Bank is IB Finance's sole asset, this Complaint refers to Defendants Ally Bank and IB Finance

collectively as "Ally Bank."  Until January 2009, ResCap had a non-controlling interest in Ally

Bank which afforded ResCap seats on Ally Bank's Board of Directors.

### 3.    Defendant Ally Securities

18.    Defendant Ally Securities is a Delaware limited liability company and a

registered broker-dealer with its principal place of business in Minneapolis, Minnesota.  At all

times relevant to this Complaint, Ally Securities was a direct, wholly-owned subsidiary of either

RFC or GMAC-RFC Holding Company, LLC and a registered broker-dealer and member of the

National Association of Securities Dealers, Inc. ("NASD") or the Financial Industry Regulatory

Authority ("FINRA").  Ally Securities underwrote, marketed, and distributed certain of the

Securitization Sponsors' mortgage-backed and mortgage-related asset-backed securities,

including those underlying the Securitizations at issue in this Complaint.  Ally Securities also

provided capital market liquidity in mortgage-backed securities and mortgage-related asset-

backed securities sold by the Securitization Sponsors to both institutional investors and financial

institutions in the United States.  At times during the relevant time period, Ally Securities

conducted business under the brand name, GMAC-RFC Securities.

### C.    Non-Parties ResCap and the Securitization Sponsors

### 1.    Bankrupt Entity ResCap

19.    Non-party ResCap is a Delaware limited liability company, and an indirect

wholly-owned subsidiary of Ally Financial.  ResCap is registered with the Minnesota Secretary

of State as a foreign limited liability company.  From 2004 through 2007, ResCap was a leading

real estate finance enterprise, the business of which included acquiring, selling, and servicing

11

residential mortgage loans.  Its businesses covered the spectrum of the U.S. residential finance industry, from the origination and servicing of mortgage loans through their securitization on the market.  It also provided capital to other originators of mortgage loans.

20.     ResCap provided the overall management for Ally Financial's residential real estate finance business as a whole, which Ally Financial and ResCap operated through the Securitization Sponsors, as well as defendants Ally Bank and Ally Securities.  At all times relevant to this Complaint, ResCap's day-to-day business operations were run at the direction of and controlled by Ally Financial through its contribution and use of personnel and financial resources that ResCap depended on to remain in business.

21.     In September 2008, ResCap announced that it was closing much of its mortgage loan acquisition business.  On or about May 14, 2012, ResCap filed for bankruptcy protection.

2.     **Bankrupt Entity RFC**

22.     Non-party RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC is successor-in-interest to Residential Funding Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  Since 2005, RFC has been an indirect wholly-owned subsidiary of ResCap.  RFC is the defendant in a separate action encaptioned *MBIA Insurance Corp. v. Residential Funding Co., LLC*, Index No. 603552/2008 (N.Y. Sup. Ct. N.Y. Cnty.), which is currently stayed as a result of RFC filing for bankruptcy protection on May 14, 2012.  At all relevant times, RFC engaged in the selling, by means of securitization transactions, residential mortgage loans that it had acquired, as well as mortgage loans it had originated through its affiliates.  From 2002 through the first quarter of 2007, RFC sponsored securitizations of 1,313,052 first-lien mortgage

12

loans with an aggregate principal balance of $243,493,046,962. During the same period, RFC sponsored securitizations of 338,441 second-lien mortgage loans with an aggregate principal balance of $14,393,392,561. In addition, RFC, through its affiliates, acted as a servicer for mortgage loans.

### 3.    Bankrupt Entity GMAC Mortgage

23.    Non-party GMAC Mortgage, successor to GMAC Mortgage Corporation, is a Delaware limited liability corporation with its principal place of business in Fort Washington, PA. GMAC Mortgage is a direct wholly-owned subsidiary of GMAC Residential Holding Company, LLC. GMAC Mortgage is the defendant in a separate action encaptioned *MBIA Insurance Corp. v. GMAC Mortgage, LLC*, Index No. 600837/2010 (N.Y. Sup. Ct. N.Y. Cnty.), which is currently stayed as a result of GMAC Mortgage's filing for bankruptcy protection on May 14, 2012. At all relevant times, GMAC Mortgage acquired, originated, and serviced residential mortgage loans. GMAC Mortgage also sponsored securitizations of mortgage loans, including two of the Securitizations described below.

24.    The Securitization Sponsors sponsored their last residential mortgage-backed securities ("RMBS") transaction in October 2007. During the relevant time period, Defendants, ResCap, and the Securitization Sponsors were part of an integrated business organization. At the top of the organization, leading and directing the business of all of its subsidiaries, was defendant Ally Financial. Defendant Ally Financial used and relied on ResCap, the Securitization Sponsors, and the other Defendants to acquire, sell, and service residential mortgage loans, and to sponsor securitizations of mortgage loans in the form of RMBS. In particular, Ally Financial caused defendant Ally Bank to finance the Securitization Sponsors' origination, acquisition, securitization, and servicing activities relating to residential

13

mortgage loans. Ally Financial also caused and relied on defendant Ally Securities to underwrite the securities issued in connection with the securitizations sponsored by the Securitization Sponsors.

4.   **Bankrupt Entity Homecomings**

25.   Non-party Homecomings is a Delaware limited liability company. Homecomings was incorporated as a wholly-owned subsidiary of RFC in 1995 in order to service and originate mortgage loans. Homecomings also originated tens of thousands of mortgage loans that the Securitization Sponsors contributed to the Securitizations, including significant numbers of non-compliant mortgage loans that were included in the Securitizations. On or about May 14, 2012, Homecomings filed for bankruptcy protection.

## JURISDICTION AND VENUE

26.   This Court has jurisdiction over this proceeding because Defendants transact business in Minnesota, are registered to conduct business in Minnesota with the Minnesota Secretary of State, and because they committed the acts alleged herein which caused injury to MBIA.

27.   Venue is proper in this Court pursuant to Minn. Stat. § 542.09 because the cause of action arose, in part, in Hennepin County and because defendant Ally Securities resides within this county.

## FACTUAL ALLEGATIONS

A.   **The Securitization of Residential Mortgage Loans**

28.   Securitization is the act of using a financial asset, such as a mortgage loan, as security for another instrument. Acquirers and originators of mortgage loans may sponsor

14

securitization transactions to sell mortgage loans and to enable the acquisition or origination of additional mortgage loans.

29.    Securitizations can take various forms.  A common securitization form used for mortgage loans, such as the CES and HELOCs at issue, involves the creation of a trust, to which the sponsoring entity sells a portfolio of mortgage loans.  The trust will then divide the cash flows from the portfolio of mortgage loans into various pieces or "tranches" and issue securities, which are sold to investors.  Those tranches underlying the securities have different economic rights to principal and interest, among other things, and have different attributes of repayment risk.  As the United States Securities and Exchange Commission ("SEC") has observed, in many instances the transfer of assets to the trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor for a securitization program and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33–8518; 34– 50905, 70 Fed. Reg. 1,506–1,631.

30.    Because the mortgage loans and their underlying cash flows are sold to an entity, such as a trust, in connection with the securitization, the appointment of a servicer is also necessary.  The servicer's primary responsibilities are (1) collecting mortgage payments on performing mortgage loans; (2) engaging in loss mitigation efforts to increase collection efforts on delinquent mortgage loans; (3) initiating foreclosure proceedings; (4) charging-off mortgage loans when appropriate; (5) reporting key information about the mortgage loans to the trustee for dissemination to the other transaction participants; and (6) transferring collections to the trustee for distribution to the investors.  The trustee is responsible for administering the funds of the

15

trust, determining the adequacy of the trust's funds to satisfy the trust's obligations in connection with the securities issued by the trust, and making payments to the investors.

31.     Mortgage loans may take the form of CES and HELOCs. Both CES and HELOCs are second-lien loans, made in addition to the borrower's original mortgage. For CES, a borrower receives the full borrowed amount of the loan at the time of origination. For HELOCs, a borrower receives the right to draw upon a line of credit, which is collateralized by a mortgage lien, for a period of time after origination of the HELOC up to the full amount of the HELOC. The amount of a HELOC that has been drawn upon as of any date of determination is known as the "utilization," which is typically expressed as a percentage of the full amount.

32.     The financial viability of an investment in a securitization is based on the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. This risk manifests itself through delinquencies on mortgage loan payments, eventually leading to defaults on these mortgage loans. After a mortgage loan is in default, if a servicer of a mortgage loan determines that the value of net recoveries to be achieved by foreclosing upon, or comparably converting, the mortgage loan are unlikely to equal or exceed the outstanding principal balance of the delinquent mortgage loan, plus certain costs and expenses related thereto, the servicer may charge-off the delinquent mortgage loan, meaning that the servicer would write down or recognize the outstanding principal balance of the mortgage loan as zero, without a corresponding payment or receipt of principal. These delinquencies, defaults, and charge-offs have the potential to result in significant shortfalls of anticipated cash flows to the trust and, consequently, a shortfall in cash flows payable to the investors.

16

DOCS-#3759278-v2

33.     To increase marketability, lower interest costs, and mitigate the risk to the investors of a potential shortfall in anticipated cash flows to the trust, many securitizations have included a financial guaranty insurance policy from an insurer, such as MBIA.  Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium and subject to the terms and conditions of the policy, unconditionally and irrevocably guarantees to the investors that, in the event there is a shortfall in cash flows to the trust, the financial guaranty insurer will insure certain payments with respect to current interest and ultimate principal to the trustee for the benefit of the investors.  In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

34.     To satisfy both the investors and the financial guaranty insurer as to the quality of a particular portfolio of mortgage loans, the sponsor of a securitization makes disclosures and representations regarding the quality and character of the underlying mortgage loans and the underwriting standards used to acquire and underwrite the mortgage loans.  While these disclosures and representations do not entirely remove the risk of delinquency or charge-off, they are intended to assure the financial guaranty insurer, and others, that the risks are known to the insurer and that the financial guaranty insurer does not face additional, hidden risks.

35.     A sponsor's disclosures and representations in a RMBS transaction are extremely important because of the sponsor's unique and special knowledge and expertise regarding the underwriting of the mortgage loans.  The sponsor's disclosures and representations regarding the quality and character of the mortgages included in the mortgage loan portfolio and the underwriting standards used to acquire and underwrite the mortgage loans are necessary because it is neither practical nor feasible for the financial guaranty insurer to review the many

17

thousands of mortgage loans in the loan portfolio. Individual loan files are typically voluminous, containing mortgage applications, credit reports, income and employment verifications, the lender's internal documentation, and many other forms of documentation necessary to support underwriting decisions. In addition, sponsors typically require a bid from the financial guaranty insurer within a short period of time following the sponsor's initial solicitation, and the securitization's closing date is often only a few weeks later.

36.     Because the review of the loan files underlying a securitization is impractical and infeasible, a sponsor instead will provide to the financial guaranty insurer and the rating agencies, among other things, schedules and loan tapes that set forth certain financial and credit characteristics of the mortgage loans that will be transferred by the sponsor to the securitization trust.

37.     The rating agencies rely upon the data contained in the schedules and loan tapes to create expected loan-level default and loss assumptions. The loan-level default and loss assumptions are then used to create cash flow projections—including estimates of potential losses—for the securitization. Based on the expected losses for the proposed securitization under stress scenarios, the rating agencies provide the financial guaranty insurer with "shadow ratings" for the securitization transactions. The shadow rating reflects the rating agencies' determination of the relative likelihood that a given security would default on its obligations to security holders, without taking into consideration financial guaranty insurance.

38.     A financial guaranty insurer must rely on the sponsor's representations and data with respect to the quality of the mortgage loan portfolio underlying the securitization, as well as the integrity of the sponsor's underwriting policies and practices. Further, the financial guaranty insurer must also rely on the shadow ratings provided by the ratings agencies,

18

which are based on the same representations, warranties, and data provided by the sponsor to the financial guaranty insurer. In addition, it is infeasible and impractical for a financial guaranty insurer to confirm based on schedules or loan tapes whether a sponsor has underwritten the mortgage loans in compliance with its underwriting criteria. The sponsor's unique and special knowledge, and expertise regarding its underwriting practices, cannot be duplicated by the financial guaranty insurer, especially given the voluminous number of loans in the securitization and the relatively short timeframe in which the financial guaranty insurer is required to make a financial guaranty insurance underwriting decision.

**B.    Ally Financial's Real Estate Finance Enterprise**

39.    Defendants' business relied heavily on securitizations, which were sponsored primarily by two of Defendants' business units: RFC and GMAC Mortgage. By pooling mortgage loans and selling them into securitizations, the Securitization Sponsors were able to generate profit for Defendants, who, as set forth above, financed the origination of mortgage loans acquired by the Securitization Sponsors—and in many instances, originated by defendant Ally Bank or Homecomings—and earned significant fees from underwriting the RMBS transactions and servicing the underlying mortgage loans, all while reducing the credit risk retained by the Securitization Sponsors with respect to those mortgage loans.

40.    Ally Financial consolidated and held out its residential mortgage loan origination, acquisition, distribution, and servicing businesses under the ResCap banner. In so doing, Defendants operated and presented themselves as a single integrated corporate enterprise, consisting of defendant Ally Financial, defendant Ally Bank, defendant Ally Securities, ResCap, the Securitization Sponsors, and Homecomings.

41.     Ally Financial controlled the Securitization Sponsors, providing overall management and financing for their business operations. ResCap's primary business, conducted through its subsidiaries, was originating, acquiring, selling, and servicing mortgage loans. In particular, in 2006, ResCap was organized into two major operational groups: the GMAC Residential Group, which included GMAC Mortgage and the mortgage division of Ally Bank, and the Residential Capital Group, which included RFC and Ally Securities. The GMAC Residential Group and the Residential Capital Group consolidated operationally in 2007 to form ResCap's Residential Finance Group.

42.     The Securitization Sponsors were the designated sponsors/sellers, on behalf of Defendants, for the various Securitizations at issue in this Complaint. RFC also served as the master servicer for the RFC Securitizations and outsourced certain of its servicing functions to its affiliated entities Homecomings and GMAC Mortgage, which acted as subservicers, while remaining ultimately responsible for the servicing functions. GMAC Mortgage was the master servicer in the GMAC Mortgage Securitizations.

**C.     The Securitizations**

43.     The seven Securitizations at issue involve residential mortgage loans that were acquired by the Securitization Sponsors from their affiliates and third parties consisting principally of HELOCs and CES mortgage loans. RFC sponsored five of the Securitizations; GMAC Mortgage sponsored two.

44.     Today, all seven Securitizations are substantially impaired. As a result, MBIA has paid (and expects to pay) net claims in excess of $2 billion for the Securitizations in satisfaction of its insurance obligations to the trusts.

20

1.     **The GMAC Mortgage Securitizations**

45.     The GMAC Mortgage Securitizations consist of second-lien mortgage loan pools. The two mortgage loan securitization transactions at issue are: GMAC Mortgage Corporation Home Equity Loan Trust 2006-HE4 ("2006-HE4") and GMAC Mortgage Corporation Home Equity Loan Trust 2007-HE1 ("2007-HE1").[4] 2006-HE4 and 2007-HE1 are referred to herein collectively as the "GMAC Mortgage Securitizations."

46.     Certain of the basic characteristics of each of the GMAC Mortgage Securitizations at the time of closing are set forth in the following table:

| Transaction | Date of Closing | Number of Loans at Cut-off Date | Aggregate Principal Balance Issued at Cut-off Date |
|---|---|---|---|
| 2006-HE4 | September 27, 2006 | 17,342 | $856,448,671 |
| 2007-HE1 | March 29, 2007 | 16,638 | $889,720,420 |
| Totals: | | 33,980 | $1.746 billion |

47.     In each GMAC Mortgage Securitization, the aggregate note balance represented the face value of the notes issued at closing, an amount which should not be exceeded by the aggregate principal balance of the mortgage loans backing those notes.

48.     The GMAC Mortgage Securitizations were structured to permit GMAC Mortgage to add mortgage loans to the pools during specified periods after closing. In each GMAC Mortgage Securitization, the mortgage loan pool was not fully populated at closing. Rather, GMAC Mortgage was permitted to sell loans to the pool for a three-month "Pre-Funding Period" immediately after closing, in exchange for payments made by the trust, until the aggregate principal balance of the loans in the pool approached the aggregate note balance. 2006-HE4 also permitted GMAC Mortgage to sell loans during specified periods—called

---

[4]    The GMAC Mortgage Action also includes the GMAC Mortgage Corporation Home Equity Loan Trust 2004-HE4 transaction, which involved over $1.6 billion in loans.

"Revolving" and "Managed Amortization Periods"—on the condition that the aggregate principal balance of the pool at any given time never exceeded the balance at closing.

49.    The feature of adding the so-called "Subsequent Mortgage Loans" thus enabled GMAC Mortgage for a number of years past closing to continue to shift credit risk to investors and to MBIA, in exchange for immediate gains on the loans it sold.  In creating the Revolving and Managed Amortization periods, in particular, the parties agreed that as the aggregate loan balance of each pool fell—a characteristic that is usually the result of borrowers paying off their loans—Ally Bank and GMAC Mortgage could sell new loans to the pool and MBIA would continue to insure payments to holders of the RMBS for which the pool served as collateral.  Critical to MBIA's acceptance of the feature of the Subsequent Mortgage Loans were GMAC Mortgage's representations and warranties that any loan added to a pool after closing would conform to the same representations and warranties GMAC Mortgage made about the quality and underwriting of the loans in the pool at closing.

50.    The approximate number and dollar amount of loans in each GMAC Mortgage Securitization over the entire life of the GMAC Mortgage Securitizations are set forth in the following table:

| Transaction | Date of Closing | Aggregate Number of Loans in Pool During Life of Securitization | Aggregate Principal Balance of Loans in Pool During Life of Securitization |
|---|---|---|---|
| 2006-HE4 | September 27, 2006 | 31,475 | $1,550,141,454 |
| 2007-HE1 | March 29, 2007 | 22,132 | $1,185,871,165 |
| **Totals:** | | **53,607** | **$2.736 billion** |

51.    ResCap, through GMAC Mortgage and other wholly-owned subsidiaries and affiliates, carried out the steps of each GMAC Mortgage Securitization.  Over 80% of the

22

mortgage loans in the pools were originated or acquired by defendant Ally Bank. GMAC Mortgage then conveyed, directly or indirectly, mortgage loans it had originated or acquired from Ally Bank to a special purpose vehicle that acted as the depositor and transferred the loans to the trust created by GMAC Mortgage for each Securitization.

52.    In addition to its role as the sponsor in each GMAC Mortgage Securitization, GMAC Mortgage was also appointed the servicer for each of the loan pools. The Servicing Agreements provided that GMAC Mortgage would collect prorated monthly fees equal to 0.50% per year of the outstanding principal balance of each loan it serviced, in exchange for servicing the loan pool in compliance with its "normal and usual" procedures, which included making reasonable efforts to collect all payments due from borrowers. On October 1, 2009, servicing was transferred from GMAC Mortgage as Master Servicer, and MBIA appointed new Master Servicers for the GMAC Mortgage Securitizations. As such, GMAC Mortgage was not involved with the servicing of the mortgage loans related to the RFC Securitizations after October 1, 2009.

53.    As part of Defendants' integrated RMBS business activities, Defendants caused Ally Securities to serve as a securities underwriter and Ally Bank to serve as the custodian for each of the GMAC Mortgage Securitizations.

   2.   The RFC Securitizations

54.    The RFC Securitizations also consist of home equity mortgage loan pools, nearly all of which are second-lien home equity loans. The five securitizations sponsored by RFC at issue in the Complaint are: Home Equity Loan Trust 2006-HSA4 ("2006-HSA4"), Home Equity Loan Trust 2006-HSA5 ("2006-HSA5"), Home Equity Loan Trust 2007-HSA1 ("2007-HSA1"), Home Equity Loan Trust 2007-HSA2 ("2007-HSA2"), and Home Equity Loan

23

Trust 2007-HSA3 ("2007-HSA3").   2006-HSA4, 2006-HSA5, 2007-HSA1, 2007-HSA2, and 2007-HSA3 are referred to herein collectively as the "RFC Securitizations."

55.   Certain of the basic characteristics of each of the RFC Securitizations at the time of closing are set forth in the following table:

| Transaction | Date of Closing | Number of Loans at Cut-off Date | Initial Principal Balance Issued at Cut-off Date |
|---|---|---|---|
| 2006-HSA4 | July 28, 2006 | 8,954 | $402,118,000 |
| 2006-HSA5 | September 28, 2006 | 5,124 | $295,648,000 |
| 2007-HSA1 | February 27, 2007 | 9,484 | $546,774,000 |
| 2007-HSA2 | April 27, 2007 | 24,092 | $1,300,997,943 |
| 2007-HSA3 | May 30, 2007 | 15,414 | $830,313,476 |
| Totals: | | 63,068 | $3,375,851,419 |

According to the applicable transaction documents, approximately 56% of the home equity mortgage loans in the RFC Securitizations were CES and approximately 44% were HELOCs.

56.   RFC was the contractual seller for the RFC Securitizations.   Thirty-three percent of the loans contained in the RFC Securitizations were originated by ResCap's subsidiary, Homecomings.

57.   RFC was also the Master Servicer for the RFC Securitizations and outsourced certain of its servicing functions to affiliated entities, which acted as subservicers, even though RFC remained ultimately responsible for the servicing functions.  On November 2, 2009, servicing was transferred from RFC as Master Servicer, and MBIA appointed new Master Servicers for the RFC Securitizations.  As such, neither RFC nor its subservicer affiliates were involved with the servicing of the mortgage loans related to the RFC Securitizations after November 2, 2009.

24

58.     As part of Defendants' integrated RMBS business activities, Defendants caused Ally Securities to serve as a securities underwriter for each of the RFC Securitizations.

### 3.    MBIA Was Fraudulently Induced to Insure the Securitizations

59.     Defendants assisted the Securitization Sponsors in making a number of misrepresentations to induce MBIA to enter into the Insurance Agreements and issue the Policies.   Specifically, the Securitization Sponsors either provided or caused MBIA to be provided with loan tapes, Prospectuses, and shadow ratings that contained materially false and misleading information.   The Securitization Sponsors further provided MBIA with express assurances concerning the quality of the underlying mortgage loans and the Securitization Sponsors' business practices as further means of inducing MBIA to participate in the Securitizations.

60.     Prior to the closing of each of the Securitizations, the Securitization Sponsors provided MBIA with loan tapes of loan information as a means of inducing MBIA's participation in the Securitizations.   Specifically, the Securitization Sponsors emailed to MBIA loan tapes on the following dates:   May 22, 2006 (2006-HSA4), July 12, 2006 (2006-HSA4), August 1, 2006 (2006-HSA5), September 11, 2006 (2006-HSA5 and 2006-HE4), September 12, 2006 (2006-HSA5), September 13, 2006 (2006-HSA5, 2006-HE4), January 30, 2007 (2007-HSA1), February 5, 2007 (HSA-1), March 1, 2007 (2007-HSA2), March 8, 2007 (2007-HE1), March 12, 2007 (2007-HE1), March 14, 2007 (2007-HSA2), April 4, 2007 (2007-HSA2), April 23, 2007 (2007-HSA2), May 8, 2007 (2007-HSA3), May 18, 2007 (2007-HSA3), May 21, 2007 (2007-HSA3), May 31, 2007 (2007-HSA3).   These loan tapes were replete with false statistics relating to individual loans.   In many instances, debt-to-income ("DTI") and combined loan-to-value ("CLTV") ratios, for example, were falsely understated in the tapes.   Schedules provided

25

to MBIA, which also were reproduced in the Prospectuses for the Securitizations, contained pool-level statistics about DTI and CLTV ratios, among other information, that were likewise materially false. The DTI ratios were materially false and misleading because the monthly income was falsely overstated or monthly debt obligations falsely understated. Additionally, the CLTV ratios presented in those schedules were materially false and misleading because, among other things, the value of the underlying collateral was falsely overstated. Examples of other fields that contained materially incorrect information are "doc type," "reserves," and "residual income."

61.   Defendant Ally Securities and the Securitization Sponsors prepared and issued Prospectuses in connection with the Securitizations. Ally Securities reviewed and participated in the drafting of the Prospectuses. The Prospectuses contained specific statements concerning the characteristics of the mortgage loans underlying the Securitizations, which were similarly based on the false information in the loan tapes. For example, the Prospectuses falsely state that loans were generally originated subject to a maximum total monthly DTI ratio of 45% and a maximum CLTV ratio of 100%, when in truth the Securitization Sponsors frequently added loans into the Securitizations with DTI and CLTV ratios exceeding these parameters. The Prospectuses also contained numerous statements regarding the underwriting practices and standards that the Securitization Sponsors applied to the mortgage loans included in the Securitizations. These statements were materially false and misleading. Contrary to the statements in the Prospectuses, the Securitization Sponsors did not "in most cases" or even "generally" follow their respective underwriting practices and standards in connection with their acquisition of the loans contained in the Securitizations. In fact, just the opposite was the case: the Securitization Sponsors systemically acquired mortgage loans that were *not* underwritten in

26

substantial compliance with the applicable underwriting standards, including almost every mortgage loan included in the Securitizations.

62.     The Prospectuses further contained materially false and misleading statements concerning the Securitization Sponsors' use of documentation provided in the mortgage loan application process to accurately determine a mortgagor's creditworthiness and to verify their employment history, reserves, and residual income; the quality and nature of the property appraisals obtained for the underlying mortgage loans; the mortgage loans' compliance with applicable laws; and the truth and accuracy of the information that was being provided to MBIA regarding the mortgage loans.  In fact, the loan underwriters routinely failed to collect applicable employment, credit, and property information and also regularly failed to make determinations that the borrower had the ability to repay his or her mortgage loan.

63.     Prior to the closing of each Securitization, as an express condition to providing a Policy, MBIA required that the Securitization Sponsors obtain a specific investment-grade shadow rating.  In providing the shadow ratings for each Securitization, however, the rating agencies were provided the same (or substantially the same) loan-level data and other information that was provided to MBIA.   The rating agencies also relied on the same representations and warranties concerning the accuracy of that information and the Securitization Sponsors' underwriting standards.  Because the loan information provided to the rating agencies was materially false and misleading, however, the shadow ratings were meaningless.

64.     MBIA was materially misled about the Securitizations Sponsors' business practices and their impact on the quality of the loans included in the Securitizations.  For example, the Securitization Sponsors failed to disclose that the credit quality of the loans that were acquired and sold in connection with the Securitizations was significantly riskier than was

27

represented in the Prospectuses and the loan tapes. In that regard, RFC reassured MBIA that all of its HELOC loans were subject to review and that any such loans that fell outside of RFC's underwriting guidelines would be re-underwritten prior to being included in any securitization, despite knowing that such reassurance was false.

### 4. Additional False Representations Made to MBIA to Fraudulently Induce MBIA to Insure the Securitizations

65. The Securitization Sponsors made additional misrepresentations to MBIA to induce MBIA to insure the Securitizations. In connection with each Securitization, the relevant Securitization Sponsor entered into an Insurance Agreement with MBIA pursuant to which MBIA issued the Policies. The Policies issued by MBIA increased the marketability of the securities, for the benefit of the Securitization Sponsors, and, in turn, Defendants, by mitigating the risk to potential investors of any shortfalls in anticipated cash flows, which allowed for more liquidity and better pricing of the securities.

66. In the Insurance Agreements, the Securitization Sponsors made numerous representations and warranties to MBIA in connection with each Securitization. For example, the Securitization Sponsors made representations and warranties to MBIA concerning (1) the key characteristics of the mortgage loans that backed the securities issued in the Securitizations and (2) the underwriting standards used by the originators whose loans were acquired and sold into the pools of loans to be securitized, including originators defendant Ally Bank, GMAC Mortgage, RFC, and Homecomings. The Securitization Sponsors also made numerous representations and warranties to the rating agencies that contributed to the issuance of meaningless shadow ratings by the rating agencies. These representations and warranties, as well as the shadow ratings, were a material inducement to MBIA to enter into the Policies.

28

67.    The Insurance Agreements incorporated by reference, for MBIA's benefit, the representations and warranties contained in the "Transaction Documents," as that term was defined in the Insurance Agreements.   This incorporation by reference of the Transaction Documents into the Insurance Agreements granted to MBIA the right to rely upon representations and warranties made to other parties to the Securitizations and also to investors. For each Securitization, "Transaction Documents" was defined to include, among other documents, (1) the mortgage loan purchase agreements, or an assignment and assumption agreement, as applicable, that set forth the terms of the sale of the mortgage loans to the relevant trust (collectively, the "Purchase Agreements"); (2) the servicing agreements that set forth the terms for servicing the relevant pool of mortgage loans (collectively, the "Servicing Agreements"); and (3) the offering materials provided to potential investors and filed with the SEC to market the securities issued by the trusts in connection with the Securitizations, including the Prospectuses (collectively, the "Offering Documents").   MBIA is an express third-party beneficiary of the Purchase Agreements and the Servicing Agreements.

68.    The Securitization Sponsors made two representations and warranties directly to MBIA in the Insurance Agreements that are particularly relevant to this action.

69.    First, the Securitization Sponsors represented and warranted that any information they furnished or supplied for inclusion in the Transaction Documents, and any information relating to the mortgage loans that they furnished to MBIA, was accurate and not misleading.   Specifically, each of the Insurance Agreements contains a representation and warranty substantially similar to the following:

29

> Neither the information supplied by [the Securitization Sponsors]
> contained in the Transaction Documents to which it is a party nor
> any other material information relating to the [mortgage loans] . . .
> furnished to the Insurer by [the Securitization Sponsors] . . .
> contains any statement of material fact made by [the Securitization
> Sponsors] which was untrue or misleading in any material respect
> as of the date reflected therein.

Through these provisions, the Securitization Sponsors represented and warranted that the specific

information they provided for inclusion in, among other things, the Prospectuses issued at or

around the time that each of the Securitizations closed, as well as the loan tapes of loan

information provided to MBIA prior to each Securitization, was accurate and not untrue or

misleading in any material respect.

70.    Second, the Securitization Sponsors represented and warranted that all

representations and warranties in each of the Transaction Documents to which they were a party

were "true and correct in all material respects," and that they made all of those representations

and warranties "to, and for the benefit of, [MBIA] as if the same were set forth in full herein [*i.e.*,

in the Insurance Agreement itself]."   The Securitization Sponsors thus remade for MBIA's

benefit the representations and warranties that it had initially made in the Purchase Agreements

and the other Transaction Documents.

71.    The representations and warranties made to MBIA by RFC in connection

with the RFC Securitizations include, without limitation, (1) all of the home equity mortgage

loans included in the RFC Securitizations were underwritten in substantial compliance with

RFC's published program criteria and guidelines; (2) no acceleration events, defaults, breaches

or violations existed under the underlying mortgages or mortgage notes; (3) the mortgage loan

files were complete; (4) the home equity mortgage loans complied with all applicable laws; (5)

the CLTV ratio of each mortgage loan was not in excess of 100%; and (6) the information RFC

cv-02563-SRN-TNL   Doc. 1-2   Filed 10/05/12   Page 31 of 59

provided regarding the home equity mortgage loans, including the information set forth in the loan tapes, was true and correct in all material respects.

72.     Similarly, GMAC Mortgage made representations and warranties to MBIA, including, without limitation, (1) GMAC Mortgage used no selection procedures that identified the mortgage loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMAC Mortgage under the GMAC Mortgage home equity program; (2) the mortgage loans were representative of GMAC Mortgage's portfolio of mortgage loans originated under GMAC Mortgage's home equity program; (3) no acceleration events, defaults, breaches, or violations existed under the underlying mortgages or mortgage notes; (4) to the best of GMAC Mortgage's knowledge, there was no valid offset, defense or counterclaim of any obligor under any underlying mortgage or mortgage note; (5) the mortgage loan files were complete; (6) to the best of GMAC Mortgage's knowledge, the mortgage loans complied with all applicable laws; (7) the CLTV ratio of each mortgage loan was not in excess of 100%; and (8) the information GMAC Mortgage provided regarding the mortgage loans, including the information set forth in the loan tapes, was true and correct in all material respects.

73.     Additionally, pursuant to the Purchase Agreements and the Servicing Agreements, MBIA is entitled to notify the appropriate Securitization Sponsor if it discovers or has knowledge that any particular loan fails to conform to the above representations and warranties in a manner that "materially and adversely affects" MBIA's interests. Within 90 days of such notice, the applicable Securitization Sponsor is obligated to cure the breach, repurchase the defective loan, or substitute a conforming loan. Because the Securitization Sponsors had control over information about the origination of the loans, the Servicing Agreements also obligated them to give prompt written notice to MBIA if they were aware that any such non-

31

conforming loans were in the pools.  In addition, the Securitization Sponsors represented and warranted in the Insurance Agreements that they would promptly provide all data reasonably requested by MBIA and would not "interfere in any material respect with the enforcement of any rights of [MBIA] under or with respect to any of the Transaction Documents."

74.    The Insurance Agreements also incorporated the representations and warranties that the Securitization Sponsors made in the Servicing Agreements in their capacities as servicer.  In the Servicing Agreements, the Securitization Sponsors, covenanted, represented and warranted that they would service the mortgage loans in each of the Securitizations in a manner generally consistent with their own servicing guidelines.  They also covenanted, represented, and warranted that they would use all of their "normal and usual" procedures in servicing the mortgage loans, which included making reasonable efforts to collect all payments due from borrowers.  They also pledged to "enforce the representations and warranties of the Seller pursuant to the Purchase Agreement."

75.    As discussed below, the representations and warranties made by the Securitization Sponsors to MBIA in the Insurance Agreements and the Transaction Documents were materially false and misleading.

5.    **MBIA Discovers the Fraud Perpetrated by the Securitization Sponsors**

76.    After closing, the Securitizations have performed extremely poorly. Delinquencies and charge-offs for mortgage loans in the Securitization loan pools have been much higher than would be expected for loan pools comprised of prime quality loans, as the Securitization Sponsors represented and warranted.  These delinquencies and charge-offs have significantly diminished the cash flow to the trusts associated with each Securitization, which has

32

required and will continue to require MBIA to satisfy its obligations under the Insurance Agreements and the Policies by making payments to cover these shortfalls.

77.     For the GMAC Mortgage Securitizations, by the end of 2009, loans representing over 15% of the initial aggregate pool balance in the 2006-HE4 had defaulted and been charged-off, and a total of at least $326 million has been lost from the original aggregate pool balances due to defaulted and charged-off loans.

78.     For the RFC Securitizations, as of December 25, 2009, a total of 21,237 mortgage loans, representing a staggering 34% of the mortgage loans underlying the transactions, had been charged-off or were delinquent.

79.     Based in part on the poor performance of the Securitizations, MBIA exercised its contractual rights to request from the Securitization Sponsors access to mortgage documents for loans in the Securitizations.  MBIA then reviewed and analyzed those mortgage loan documents, and determined that mortgage loans evidenced misrepresentations made by the Securitization Sponsors and that the representations and warranties that the Securitization Sponsors provided were pervasively breached.  MBIA subsequently initiated lawsuits against the Securitization Sponsors by filing the complaints discussed above.

80.     As part of its review of mortgage loan documents received from GMAC Mortgage, MBIA discovered that the overwhelming majority of the delinquent or charged-off loans—at least 89%—evidenced one or more misrepresentations by GMAC Mortgage, representing over $246 million of the original principal balance of the loans in the Securitizations.  MBIA similarly discovered that, based on its review of mortgage loan documents received from RFC, nearly every loan in the RFC Securitizations that it had reviewed evidenced one or more misrepresentations by RFC.

33

81.    In particular, loans placed by RFC into the Securitizations evidenced, among other things, the following misrepresentations: (1) all of the home equity mortgage loans included in the Securitizations were underwritten in substantial compliance with RFC's published program criteria and guidelines; (2) no acceleration events, defaults, breaches or violations existed under the underlying mortgages or mortgage notes; (3) the mortgage loan files were complete; (4) the home equity mortgage loans complied with all applicable laws; (5) the mortgage loans did not have CLTVs in excess of 100%; (6) the mortgage loans did not generally have DTIs in excess of 45%; and (7) the information RFC provided regarding the home equity mortgage loans was true and correct in all material respects.

82.    Similarly, the loans contributed by GMAC Mortgage to the Securitizations evidenced, among other things, the following misrepresentations: (1) GMAC Mortgage used no selection procedures that identified the mortgage loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMAC Mortgage under the GMAC Mortgage Home Equity Program, and the mortgage loans are representative of GMAC Mortgage's portfolio of home equity lines of credit that were originated under the GMAC Mortgage Home Equity Program; (2) no acceleration events, defaults, breaches or violations existed under the underlying mortgages or mortgage notes; (3) the mortgage loan files were complete; (4) the mortgage loans complied with all applicable laws; (5) the information GMAC Mortgage provided regarding the mortgage loans was true and correct in all material respects; and (6) the CLTV ratio of each mortgage loan was not in excess of 100%.

83.    Most of the loans found by MBIA to be non-compliant with the representations and warranties that the Securitization Sponsors made to MBIA evidenced

34

multiple misrepresentations. As a result of these misrepresentations, the true risk profile of these

loans was materially understated to MBIA. Examples include the following:

- The Securitization Sponsors egregiously and routinely misrepresented that the mortgage loans were (i) in the case of RFC, underwritten substantially in compliance with the applicable underwriting standards and, (ii) in the case of GMAC Mortgage, were representative of loans originated under the sponsor's loan programs.

- A significant number of mortgage loans were made on the basis of "stated incomes" that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in the applicable Securitization Sponsors' program guide (the "Underwriting Guidelines") or the Purchase Agreements or Prospectuses.

- Contrary to the applicable Underwriting Guidelines, the Securitization Sponsors failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history; approved mortgage loans with ineligible collateral; approved mortgage loans to borrowers with ineligible credit scores; and approved loans without verifying that the borrower had sufficient funds or reserves.

- RFC improperly relied upon its proprietary automated loan slotting program, known as "Assetwise," to fund loans that did not comply with its Underwriting Guidelines and also made Assetwise available to affiliates and to loan seller clients. Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in the applicable Underwriting Guidelines. As a result, RFC routinely contributed loans to the Securitizations that failed to comply with the applicable underwriting standards.

- The Securitization Sponsors knowingly and deliberately pooled non-compliant loans into the Securitizations by utilizing pooling parameters that were at odds with those in the applicable program guide and with typical representations and warranties for similar securitizations.

- In the RFC Securitizations, RFC falsely stated that it purchased a significant number of the loans in the Securitizations loans through the use of automated underwriting systems that, in general, were programmed to review most of the information set forth in the RFC's Seller Guides as the necessary criteria to satisfy RFC's Underwriting Guidelines. RFC did not have such an automated underwriting tool, however, much less an automated tool that ensured that (i) RFC bought only loans that complied with the applicable program criteria or (ii) any non-compliant loans purchased were segregated so as not to be included in securitizations.

35

- In the GMAC Securitizations, GMAC Mortgage routinely misrepresented that the mortgage loan files were complete and contained all required documents and instruments. The vast majority of mortgage loan files were missing necessary mortgage loan documents, such as disclosures relating to loan transfers and notes establishing the first lien. The absence of these and other necessary documents from the loan files impeded the ability of the trustees for the Transactions to enforce their rights and remedies with respect to delinquent mortgages. The failure to maintain the required loan documentation also impaired proper servicing.

- The Securitization Sponsors falsely represented that all mortgage loans would comply with all local, state, and federal laws, by furnishing, among other things, mortgage loans to the pools that violated the federal Truth in Lending Act and state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices by, for example, prohibiting the approval of a loan to a borrower who lacks the ability to repay.

- The Securitization Sponsors falsely represented that each mortgage loan had been made to a borrower who was able to repay his or her mortgage loan.

- The Securitization Sponsors contributed loans to the Securitizations that did not comply with the applicable Underwriting Guidelines, because the loans had been originated through the purported grant of "exceptions" to the Underwriting Guidelines. The Underwriting Guidelines, however, only allowed such exceptions to be granted in specifically defined and limited circumstances, where compensating factors offsetting the credit risk associated with a non-compliant loan had been identified in good faith and documented prior to the loan's acquisition. For a significant number of non-compliant mortgage loans, the Securitization Sponsors did not identify any specifically defined exception, or document any valid compensating factor that justified an exception to Underwriting Guidelines.

- In the RFC Securitizations, RFC engaged in improper underwriting practices such as entering into "negotiated criteria" agreements to modify the program criteria for loans in the Securitizations. In "negotiated criteria" agreements, RFC prospectively entered into agreements with loan originators whereby RFC agreed that the loan originator could originate mortgage loans that failed to comply with applicable Underwriting Guidelines and that RFC would still purchase these mortgage loans, notwithstanding the fact that they understood that these mortgage loans would not comply with applicable Underwriting Guidelines. Even though RFC knew that mortgage loans acquired from the loan originators through the "negotiated criteria" agreements did not comply with applicable Underwriting Guidelines, it contributed these non-compliant mortgage

36

loans to the mortgage loan pools underlying the Securitizations and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with applicable Underwriting Guidelines.

• In the RFC Securitizations, RFC engaged in improper underwriting practices such as participation in "bulk purchase programs," to modify the program criteria for loans in the Securitizations. In a "bulk purchase program," RFC entered into a transaction with a loan seller whereby RFC agreed to purchase a bulk amount of mortgage loans that had already been originated and were owned by that loan seller. In connection with these "bulk purchases," RFC did not undertake to re-underwrite or confirm that the mortgage loans being acquired complied with applicable Underwriting Guidelines. Instead, RFC agreed with the loan seller that it would acquire mortgage loans from that loan seller regardless of whether the mortgage loans complied with applicable Underwriting Guidelines. In many instances, the mortgage loans, in fact, did not comply with applicable Underwriting Guidelines. Notwithstanding that RFC knew that mortgage loans acquired through the "bulk purchase programs" did not comply with applicable Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the Securitizations and falsely represented to MBIA that these mortgage loans were underwritten in substantial compliance with applicable Underwriting Guidelines.

84.     The gross underwriting deficiencies MBIA identified in its review establish that the Securitization Sponsors misrepresented the underwriting criteria used to originate and acquire mortgage loans. They also falsely represented information about the mortgage loans knowing that such information was not accurate or truthful, but rather misleading in material respects. The Securitization Sponsors made these misrepresentations with the intent to deceive MBIA and to induce MBIA to rely upon the misrepresentations in entering into the insurance agreements.

85.     The Securitization Sponsors intended to deceive MBIA through the shadow ratings that they caused to be provided to MBIA, with knowledge that MBIA would rely on them. The Securitization Sponsors obtained shadow ratings of the level that they knew that MBIA would require by knowingly providing to the rating agencies the same false loan tapes

37

and pool-level data that they provided to MBIA. The Securitization Sponsors knew that the rating agencies would rely on the false information, including false data about key characteristics of the mortgage loans and the loan pools and, as a result, issued materially misleading and unreliable shadow ratings. Through the provision of false information to Moody's Investors Service and Standard & Poor's Rating Services, Inc., the Securitization Sponsors ensured that MBIA would be provided with unreliable shadow ratings that concealed from MBIA the true risk in the loan pools.

86.     Importantly, the Securitization Sponsors, knew that MBIA would not only rely on their false representations but would be unable to detect any falsity. MBIA was prevented from discovering the scheme to defraud before being induced to enter into the Insurance Agreements because (1) MBIA had no contractual right or meaningful ability to review loan origination files before closing; (2) MBIA reasonably followed the industry practice of relying on the sponsors' representations and warranties about the matters within the sponsors' special expertise and unique knowledge, namely the mortgage loans and the underwriting guidelines under which they were acquired and originated; and (3) MBIA had placed its trust and confidence in the Securitization Sponsors, as a result of an ongoing business relationship with them. The Securitization Sponsors capitalized on MBIA's inability to discover the falsity of its representations by passing the risks embedded in the Securitizations' loan pools to unwitting investors and, ultimately, to MBIA.

87.     The Securitization Sponsors compounded the harm inflicted on MBIA by falsely representing that the Securitization Sponsors would, as servicers, (1) provide prompt written notice to MBIA if it was aware of loans in the pools that failed to conform with the Securitization Sponsors' representations and warranties in a manner that materially and

38

adversely affected MBIA's interests; (2) make reasonable efforts to collect all payments due from borrowers and service loans in a manner consistent with its own servicing guidelines; and (3) enforce the representations and warranties it made in the Purchase Agreements.

88.     MBIA provided the Securitization Sponsors with notice of the non-conforming loans that MBIA uncovered through its review, although as originator, financier, owner, and servicer of the loans, Defendants and the Securitization Sponsors were well aware that such loans pervaded the pools and materially and adversely affected MBIA's interests.

89.     Similarly, while the Securitization Sponsors provided Officer Certifications in connection with the Securitizations, which stated that the representations and warranties were true and correct in all material respects, the certifications were executed by signatories who did nothing to confirm the truthfulness of that statement. At least one signatory for the Securitization Sponsors was also an employee of defendant Ally Bank.

90.     Through the egregious and pervasive misrepresentations, the Securitization Sponsors knowingly misled MBIA into issuing the Policies for the Securitizations without disclosing their substantial, hidden risks, thereby passing those risks to MBIA. By misleading MBIA into issuing the Policies, the Securitization Sponsors were able to sell mortgage loans that the Securitization Sponsors held at a higher price to investors in the Securitizations for an inflated price and to then earn fees for servicing the mortgage loans underlying the Securitizations.

91.     Further, as a result of the egregious and pervasive misrepresentations, the Securitization Sponsors caused the rating agencies to issue meaningless shadow ratings for the Securitizations, which the rating agencies would otherwise not have issued, on which MBIA relied.

39

92.     The false misrepresentations materially undermined and distorted the fundamental basis upon which MBIA agreed to issue the Policies.  The substantial and hidden risks present in the Securitizations, which were disguised by the Securitization Sponsors' misrepresentations, materialized in respect of a substantial number of mortgage loans in the Securitizations becoming delinquent and charged-off at a severe and unexpected rate.  As a result, significant shortfalls in cash flows to the trusts occurred, which required MBIA to incur losses from honoring its obligations under the Policies issued for the Securitizations.  MBIA has incurred, and will continue to incur, significant losses in connection with its obligations under the Policies to insure certain shortfalls in payments to investors in the Securitizations, all as a result of the pervasive misrepresentations and misleading conduct engaged in by the Securitization Sponsors and Defendants.

**D.      Defendants Actively Participated in the Securitization Sponsors' Fraud**

93.     Defendants actively participated in the fraudulent scheme perpetrated on MBIA by the Securitization Sponsors.  Defendants knew that the Securitization Sponsors were perpetrating a fraud on MBIA.

**1.      Ally Financial Controlled and Audited the Securitization Sponsors**

94.     Defendant Ally Financial is the ultimate parent of all of the other Defendants to this action.  Ally Financial also indirectly owns ResCap, which indirectly owns RFC and GMAC Mortgage.  Ally Financial—as the ultimate parent of ResCap, RFC, and GMAC Mortgage—had the practical ability, which it repeatedly and admittedly exercised, to direct and control the operations and actions of its subsidiaries, including in connection with the Securitizations.  Indeed in 2011, Ally Financial admitted to the Federal Reserve Board and the FDIC that it "indirectly owns and control[s] . . . numerous direct and indirect nonbank

40

subsidiaries, including [ResCap], and its direct and indirect subsidiaries . . . ." More recently, the Chief Financial Officer of ResCap conceded in the bankruptcy proceedings that "the mortgage loan origination, servicing and related securitization operations of [Ally Financial] are an integrated business involving the Debtors and Ally Bank."

95.    Ally Financial's public statements and actions from around the time the Securitizations closed until present demonstrate that Ally Financial (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management, and employees with its subsidiaries; (iii) considers its mortgage businesses of these subsidiaries to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

96.    Throughout the relevant period, a number of Defendants' officers, directors, and employees were involved in the day-to-day business activities of ResCap and the Securitization Sponsors, including activities that form the basis of this Complaint. For example, Eric Feldstein was Ally Financial's CEO and Chairman of its Board of Directors and also served as Chairman of ResCap's Board of Directors, and Sanjiv Khattri served as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO of ResCap. Indeed, Mr. Khattri was among the Ally Financial and ResCap executives who met with MBIA in 2007 to discuss expanding the relationship between MBIA and ResCap via its subsidiaries, RFC and GMAC Mortgage. Numerous other individuals served as directors and officers of both Ally Financial and ResCap, with many serving in roles directly related to the mortgage operations of both companies.

97.    As a result of its domination and control over ResCap, as well as the shared officers and directors among and between Ally Financial, ResCap, the Securitization

41

Sponsors, and the other Defendants, Ally Financial was aware of and ultimately directed and approved the Securitization Sponsors' material misrepresentations to MBIA.

98.    As a result of the overlapping personnel, intertwined business operations, and the flow of information among the members of the Ally family structure, information regarding the representations being made to MBIA was shared between the Securitization Sponsors and Defendants.

99.    Defendants knew the truth about the Securitization Sponsors' disregard for their respective program criteria and underwriting standards in connection with acquiring mortgage loans that they contributed to the Securitizations.  Among other things, Ally Financial was responsible for auditing the internal controls of ResCap, including its affiliated entities RFC and GMAC Mortgage, to ensure compliance with prevailing origination standards and legal requirements.  GM Audit Services, an Ally Financial business unit, was responsible for auditing ResCap's and the Securitization Sponsors' internal controls relating to, among other things, loan acquisition, distribution and servicing functions including those for RFC, GMAC Mortgage and Homecomings and credit underwriting standards.  The reports from those audits were provided to officers and directors of Ally Financial and ResCap.

100.    Because GM Audit Services was responsible for auditing ResCap's and the Securitization Sponsors' loan acquisition, distribution, servicing and underwriting processes and procedures, the officers, directors and other senior employees of Ally Financial knew both the extent to which ResCap had failed to properly service the loans collateralizing the RFC and GMAC Mortgage Securitizations, and the pervasive and extensive nature in which RFC and GMAC Mortgage were violating their underwriting guidelines and representations and

warranties in connection with their securitizations, including in the Securitizations at issue in this Complaint.

101. Ally Financial also hand-picked ResCap's and the Securitization Sponsors' senior management. As a result, Ally Financial knew that ResCap and the Securitization Sponsors were using the substantial capital contributions and funding Ally Financial was providing to perpetrate the fraudulent securitization scheme described herein.

### 2. Ally Bank Provided Warehouse Lending, Loan Origination, and Custodial Services to Securitization Sponsors

102. During the relevant time period, Defendants, including through defendant Ally Bank, provided collateralized lines of credit ("warehouse" lending facilities), to other originators of residential mortgage loans and correspondent lenders. These facilities assisted the Securitization Sponsors in perpetrating the fraud on MBIA.

103. As of December 31, 2006, Defendants were one of the largest, if not the largest, providers of warehouse lending facilities in the United States. Providing such facilities was one of the principal activities of Ally Financial's domestic residential real estate finance business. The warehouse facilities enabled correspondent lenders and originators to finance residential mortgage loans until they were sold in the secondary mortgage loan market.

104. As of December 31, 2006, Defendants, including through Ally Bank, had total warehouse line of credit commitments of approximately $13.2 billion, against which they had advances of approximately $8.8 billion. In providing this service, Ally Bank would have known the quality of the loans funded through their warehouse lending facilities, specifically that they were not compliant with the Securitization Sponsors' underwriting guidelines and were too risky to include in a securitization. Through the Securitization Sponsors, Defendants purchased

43

approximately 23% of the mortgage loans financed by Ally Bank's warehouse lending facilities in 2006.

105. Defendants and the Securitization Sponsors originated first- and second-lien residential mortgage loans through a direct lending network, as well as by "sourcing" through mortgage brokers loans that were funded by Defendants and the Securitization Sponsors. Such mortgage loans generally closed under the brand name of one of the Securitization Sponsors. The Securitization Sponsors also originated mortgage loans directly through Homecomings in connection with refinancing activities related to mortgage loans it serviced.

106. In 2007, most of Defendants' warehouse lending facilities were provided through Ally Bank. Ally Bank's two primary investment activities were automotive and mortgage lending. The mortgage division of Ally Bank provided funding for the Securitization Sponsors' origination, acquisition, securitization and servicing activities. Ally Bank also provided collateral/pool certification and collateral document custodial services to the Securitization Sponsors' business and third-party customers.

107. Through Ally Bank, Defendants also provided warehouse lending services to originators of first- and second-lien residential mortgage loans purchased and securitized by the Securitization Sponsors throughout the relevant period.

108. Through Ally Bank's warehouse lending services, Defendants advanced funds to originators on a "wet funding" basis to provide the originators with funds to make and close new mortgage loans. Immediately upon the closing of the new loans, the warehouse lenders took a security interest in the loans as collateral for the warehouse lending. A typical warehouse lending agreement provided that the warehouse lenders would advance a stated percentage of first-lien loans, which included conforming loans eligible for sale to the mortgage

44

agencies Freddie Mac and Fannie Mae, and a lesser percentage of second lien loans, referred to as non-conforming loans, which included eligible CES and HELOCs like those later placed in the Securitizations. The warehouse lender's lien continued until the loans were sold and securitized, whereupon the warehouse loan would be repaid in applicable part from the proceeds of the securitization.

109. The warehouse lending agreements typically defined the eligible CES and HELOC loans against which the warehouse lenders would lend as "eligible non-conforming mortgage loans," and excluded from that definition delinquent loans, loans with a CLTV ratio over 100% (and later 125%), and loans as to which the originator had breached representations and warranties with respect to documentation or legal compliance. Loans that were not eligible for the warehouse line were excluded from the applicable "borrowing base," and the originator was obligated to repay the amount of such loans to reduce the line.

110. Defendants, through Ally Bank, both funded loans that were originated or acquired directly by the Securitization Sponsors and originated and acquired loans that were subsequently sold to the Securitization Sponsors. Defendants, using deposits from Ally Bank, provided capital to the Securitization Sponsors to fund the purchase of the defective mortgage loans that Ally Bank knew would ultimately end up in the Securitizations. Given this close interaction with the funding, origination, and acquisition of the loans placed into the Securitizations, Defendants, through Ally Bank, knew that these loans were defective and too risky to serve as collateral in a securitization.

111. Ally Bank also entered into contracts whereby it agreed to serve as the custodian for the GMAC Mortgage Securitizations, a role for which it collected substantial fees and allowed one of the Securitization Sponsors to continue its loan origination business. In this

45

role, Defendants, through Ally Bank, further aided GMAC Mortgage in its plan to defraud MBIA.

### 3.   Ally Securities Provided Underwriting Services to Securitization Sponsors

112.   Through defendant Ally Securities, Defendants underwrote, distributed and marketed the securities for the Securitizations. At all relevant times, Ally Securities was a registered broker-dealer and member of the NASD or FINRA. Ally Securities also provided capital markets liquidity in mortgage-backed securities and mortgage-related asset-backed securities sold to the Securitization Sponsors by both institutional investors and financial institutions. These services assisted the Securitization Sponsors in perpetrating the fraud on MBIA.

113.   As an underwriter of the Securitizations, Ally Securities was responsible for, among other things, ensuring that the disclosures concerning the loans contained in the Prospectuses prepared in connection with the Securitizations were accurate. As an affiliate of the Securitization Sponsors, Ally Securities had knowledge of the Securitization Sponsors' business practices, and was therefore uniquely positioned to ensure that the Offering Documents were accurate.

114.   As discussed above, however, the Prospectuses contained materially false and misleading disclosures concerning the characteristics of the loan pools, the Securitization Sponsors' business practices and certain of the Securitization Sponsors' representations and warranties.

115.   As an affiliate of the other Defendants and the Securitization Sponsors, Ally Securities knew that the disclosures being made in the Prospectuses were materially false

46

and misleading. Moreover, despite its central role in the Securitizations as a securities underwriter, and as a fiduciary to investors in the Securitizations, Ally Securities actively sought to advance the interests of the Securitization Sponsors, and, in turn, the interests of Defendants, in violation of its duties to the other participants in the Securitizations.

116. Further, much like Ally Financial, Defendants Ally Bank and Ally Securities shared numerous resources with the Securitization Sponsors, such as personnel and office space. As a result, Defendants Ally Bank and Ally Securities knew about the deficient loans originated and acquired by the Securitization Sponsors and their efforts to improperly include these loans into the Securitizations to defraud MBIA.

### 4. Defendants Aided and Abetted the Securitization Sponsors' Fraud

117. Defendants assisted RFC and GMAC Mortgage in their deception of MBIA. Defendants were aware of the pervasive and extensive flaws in the Securitization Sponsors' securitization practices, yet they continued to facilitate Defendants' securitization machine. Specifically, Ally Financial, ResCap, and their subsidiaries and affiliates knew of the rampant violation of the Securitization Sponsors' underwriting guidelines, representations and warranties, and contractual obligations.

118. Defendants provided substantial financial and other types of assistance to ResCap and the Securitization Sponsors in connection with fraudulently inducing MBIA to participate in the Securitizations and, ultimately, issue the Policies. Here the fraud was assisted and furthered by the audit services, underwriting services, and warehouse lending services engaged in by the Defendants. Defendants assisted the fraud when they knew that the mortgage loans underlying the Securitizations were of a substantially poorer quality than was represented to MBIA. Defendants further knew that the mortgage loans were not underwritten to the

47

standards represented to MBIA. This knowledge is based at least in part on knowledge that is imputed to Ally Financial through its subsidiaries which were, in many cases, the acquirers, sellers and servicers of the non-compliant or otherwise defective loans. Thus, as a result of its dominance over ResCap and the other defendant subsidiaries, Ally Financial knew that the representations and warranties RFC and GMAC Mortgage made to MBIA prior to and at the closing of the Securitizations, upon which MBIA reasonably relied, were false.

**E.    Defendant Ally Bank Breached the Custodial Agreements**

119.    In addition to its role in aiding GMAC Mortgage's fraud on MBIA, defendant Ally Bank separately broke contractual promises that it made to MBIA. For both of the GMAC Mortgage Securitizations, Ally Bank agreed to serve as the custodian for which it received substantial fees. Under the Custodial Agreements, which listed MBIA as an express third-party beneficiary, Custodial Agreements § 5.6, Ally Bank agreed to ensure that the Mortgage Loans contained complete and accurate information, that GMAC Mortgage was in compliance with its representations and warranties regarding the origination, selection and characteristics of the loans, and, that, if GMAC Mortgage were not in compliance, would give prompt written notice to MBIA.

120.    Specifically, Sections 2.1 and 2.2 of the Custodial Agreements provide that Ally Bank will "hold the Mortgage Notes and any Loan Agreement relating to any Subsequent Mortgage Loan," and review the mortgage notes and deliver to MBIA a certification of "the completeness of the receipt of the Mortgage Notes." Custodial Agreements §§ 2.1, 2.2.

121.    Further, Section 2.3 of the MBIA Custodial Agreements requires Ally Bank to notify MBIA of breaches of the Mortgage Loan Purchase Agreement, by providing that: "Upon discovery by the Custodian of a breach of any representation or warranty made by

48

[GMAC Mortgage] in the Purchase Agreement . . . with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [MBIA]." *Id.* § 2.3.

122.    As described above, a review of a sample of the mortgage loan documents has uncovered numerous breaches of the representations and warranties guaranteed under the Custodial Agreements, including missing Mortgage Notes or other documents necessary for closing on the loan, as well as breaches for incurable credit and compliance breaches. Ally Bank had the responsibility to notify MBIA of these breaches once they were discovered. Because Ally Bank originated or acquired over 80% of the loans at issue in the GMAC Mortgage Securitizations, it was aware of the deficiencies of these loans, but nevertheless did nothing to correct or make MBIA aware of these pervasive problems. MBIA has received no notices from Ally Bank with respect to defects in the Mortgage Note files, or with respect to breaches of the representations and warranties in the Purchase Agreements.

## FIRST CAUSE OF ACTION

### (Aiding and Abetting Common Law Fraud Against All Defendants)

123.    MBIA repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 122.

124.    As alleged in the complaints against the Securitization Sponsors, the Securitization Sponsors fraudulently induced MBIA to enter the Insurance Agreements and issue the Policies. Defendants Ally Financial, Ally Bank, and Ally Securities aided and abetted the fraud perpetrated on MBIA by the Securitization Sponsors.

125.    In connection with MBIA's issuance of the Policies, the Securitization Sponsors knowingly, intentionally, and purposefully misrepresented existing material facts

49

regarding the Securitizations, knowing that their representations were materially false, and knowing that their false representations were essential and material to MBIA's decisions to enter the Insurance Agreements and issue the Policies in connection with the Securitizations. MBIA was not aware and could not reasonably have been aware of the falsity of those representations.

126.    Among other things, the Securitization Sponsors intentionally and purposely misled MBIA by making false representations regarding the credit and collateral characteristics of the mortgage loans that they were contributing to the Securitizations, as well as the underwriting of the mortgage loans that they contributed to the Securitizations. The Securitization Sponsors knew their representations were untrue.

127.    The Securitization Sponsors misled MBIA into believing that they consistently applied their underwriting guidelines and standards when acquiring mortgage loans that they placed in the Securitizations. To the contrary, the Securitization Sponsors acquired mortgage loans by intentionally and consistently making improper and unjustified "exceptions" to their underwriting guidelines. In addition, RFC acquired mortgage loans included in the Securitizations pursuant to "negotiated criteria" agreements and "bulk purchase" agreements, which by design modified underwriting guidelines for loans that were placed in the Securitizations. Such mortgage loans were not underwritten in substantial compliance with RFC's disclosed underwriting criteria. Further, RFC improperly used and relied upon its proprietary slotting tool, Assetwise, to acquire mortgage loans in violation of its underwriting criteria.

128.    The Securitization Sponsors knew that, in the case of RFC, a substantial number of the mortgage loans that RFC acquired were not underwritten in substantial compliance with the program criteria in its underwriting guidelines, and, in the case of GMAC

50

Mortgage, that a substantial number of the mortgage loans that GMAC Mortgage acquired were not representative of loans originated under its program.   Nevertheless, the Securitization Sponsors knowingly sold tens of thousands of such non-compliant mortgage loans to the Securitizations.

129.   The Securitization Sponsors provided MBIA with loan tapes that materially misrepresented statistics relating to individual loans, including, among other false representations, understatements of DTI and CLTV ratios.   The Securitization Sponsors did so knowing that MBIA would rely on the information provided in the loan tapes in entering the Insurance Agreements and providing the Insurance Policies.

130.   The Securitization Sponsors also prepared and issued materially false and misleading Prospectuses in connection with the Securitizations.   Based on the false information in the loan tapes, the Prospectuses materially misrepresented the characteristics of the loans in the Securitizations.   The Prospectuses also contain numerous false statements regarding the underwriting practices and standards that the Securitization Sponsors applied to the mortgage loans included in the Securitizations.

131.   The Securitization Sponsors made misrepresentations about the mortgage loans to the rating agencies.   The Securitization Sponsors did so knowing that their misrepresentations would have a material impact on the rating agencies' shadow ratings, which the Securitization Sponsors knew MBIA relied on in connection with entering the Insurance Agreements and issuing the Policies.

132.   As a result of their knowing misrepresentations, the Securitization Sponsors intended to and, in fact, did defraud MBIA into issuing the Policies for the Securitizations.   The Securitization Sponsors defrauded MBIA so that they and their affiliates

51

could earn fees and profits in connection with the Securitizations, including servicing and underwriting fees. At the same time, the Securitization Sponsors were able to pass risk inherent in the poorly-underwritten, risky mortgage loans to MBIA.

133.    As a direct result of, and in reliance upon, misrepresentations made by the Securitization Sponsors, MBIA entered the Insurance Agreements and issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities. MBIA reasonably relied to its detriment on the misrepresentations made by the Securitization Sponsors. Had MBIA known the truth about the Securitization Sponsors' underwriting and acquisition practices, or the actual quality of the mortgage loans that they contributed to the Securitizations, MBIA either would not have issued the Policies or would have issued the Policies on materially different terms. As a result of the fraud perpetrated by the Securitization Sponsors, MBIA has incurred, and will continue to incur, damages.

134.    Defendants Ally Financial, Ally Bank, and Ally Securities knew that the Securitization Sponsors were perpetrating a fraud on MBIA.

135.    Among other things, Ally Financial, Ally Bank and Ally Securities knew the truth about the Securitization Sponsors' disregard for their respective program criteria and underwriting standards in connection with acquiring mortgage loans that they contributed to the Securitizations.

136.    For example, throughout 2006 and 2007, Ally Financial conducted audits of the Securitization Sponsors' business. In connection with those audits, Ally Financial learned that the Securitization Sponsors were acquiring and securitizing large numbers of mortgage loans that had not been underwritten in substantial compliance with Securitization Sponsors' program

criteria and underwriting standards, despite their representations to MBIA and investors to the contrary.

137.     Similarly, in early-2007, Ally Financial caused changes in the senior management of ResCap to be made.  In particular, Ally Financial hand-selected new managers approved by its then-controlling shareholder, Cerberus, to evaluate the Securitization Sponsors' business operations, including their underwriting standards and acquisition practices.  These new managers reported their findings to Ally Financial and ResCap.  Instead of preventing the Securitization Sponsors from continuing to securitize non-compliant loans, and perpetrate a fraud on MBIA in the process, Ally Financial and ResCap allowed the Securitization Sponsors' fraudulent scheme to continue.

138.     As detailed above, with this knowledge, Defendants assisted, advised, encouraged, ratified, aided, and abbetted the fraud.  Defendants, through Ally Bank, extended warehouse financing to the originators of non-compliant mortgage loans acquired and securitized by the Securitization Sponsors.  Additionally, Ally Bank itself originated and acquired loans that it sold to the Securitization Sponsors, which were subsequently placed into the Securitizations. As a warehouse lender, Ally Bank knew the risky nature of the mortgage loans it was financing for sale to, and purchase by, the Securitization Sponsors.  Defendants knew, through Ally Bank, that such loans were not, in the case of RFC, underwritten in substantial compliance with RFC's program criteria and underwriting guidelines, and, in the case of GMAC Mortgage, representative of loans originated under the sponsor's loan programs.

139.     Defendants, through Ally Securities, underwrote the securities issued in connection with the Securitizations.  In connection with doing so, Ally Securities prepared and utilized Prospectuses to solicit investors.  As an affiliate of the other Defendants and the

53

Securitization Sponsors, Ally Securities was aware of facts that contradicted both the Securitization Sponsors' representations to MBIA and the disclosures in the Prospectuses prepared by the Securitization Sponsors and Ally Securities.  Ally Securities knew that the Securitization Sponsors were acquiring large numbers of mortgage loans that were not underwritten in substantial compliance with ResCap's underwriting guidelines.

140.    Further, Defendants, through the Securitization Sponsors, knowingly manipulated the shadow ratings provided by the rating agencies to MBIA through a combination of failure to adhere to underwriting guidelines and the submission of loan tapes which contained false borrower information.

141.    Defendants were motivated to support and continue the Securitization Sponsors' unlawful scheme.  Defendants did not want the non-compliant risky mortgage loans to remain on the Securitization Sponsors' balance sheet when such loans defaulted, because the defaults would only further impair the value of Ally Financial, Ally Bank, ResCap, and the Securitization Sponsors.

142.    Ally Bank was motivated to support and continue the Securitization Sponsors' scheme for many reasons.  *First*, Ally Bank profited from extending warehouse financing to the originators of non-compliant loans acquired and securitized by the Securitization Sponsors.  If the fraudulent scheme ended, and the Securitization Sponsors no longer acquired non-compliant mortgage loans, the originators selling such loans would stop originating such loans, and therefore no longer need financing from Ally Bank.  Moreover, originators unable to sell already originated non-compliant mortgage loans would be unable to repay any outstanding obligations to Ally Bank, leaving Ally Bank with the risky non-compliant mortgage loans it agreed to warehouse as collateral.  *Second*, Ally Bank itself originated and acquired second-lien

54

mortgages, which it would later sell to the Securitization Sponsors.  If the Securitization Sponsors stopped their pursuit of defrauding MBIA, Ally Bank would be left holding these deficient, risky loans.  *Finally*, Ally Bank profited through serving as custodian for the GMAC Mortgage Securitizations.  Had MBIA known the true nature of the loan pools, they would not have entered into the Securitizations, and Ally Bank would not have been paid for its role as custodian.

143.   The interests of Ally Securities were similarly aligned with the other Defendants because it was motivated to continue to collect lucrative securities underwriting fees and build its brand.  These aligned incentives caused Ally Securities to ignore issues that an independent underwriter should not have and would not have ignored.

144.   Ally Financial also was motivated to see the Securitization Sponsors' scheme continue so that Ally Financial could continue to profit from and tout the growth of ResCap's servicing business, and reap profits indirectly through its ownership interests in Ally Bank and Ally Securities.

145.   The statements, conduct, and actions of Ally Financial, Ally Bank, and Ally Securities materially aided the Securitization Sponsors with their fraudulent scheme against MBIA, which the Securitization Sponsors could not have perpetrated without the substantial assistance of Defendants.

146.   MBIA has been damaged and will continue to be damaged in an amount to be determined at trial as a result of the statements, conduct and actions of Ally Financial, Ally Bank, and Ally Securities.

## SECOND CAUSE OF ACTION

### (Breach of Contract Against Ally Bank)

147. MBIA repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 146.

148. The Custodial Agreements in the GMAC Mortgage Securitizations are valid and binding agreements between the parties thereto.

149. MBIA is an express third-party beneficiary of the Custodial Agreements.

150. Defendant Ally Bank agreed in the Custodial Agreements that it would "hold the Mortgage Notes and any Loan Agreement relating to any Subsequent Mortgage Loan," review the mortgage notes and deliver to MBIA a certification of "the completeness of the receipt of the Mortgage Notes," and notify MBIA of breaches of the Mortgage Loan Purchase Agreement, by providing that: "Upon discovery by the Custodian of a breach of any representation or warranty made by [GMAC Mortgage] in the Purchase Agreement . . . with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [MBIA]." Custodial Agreements §§ 2.1–2.3.

151. Ally Bank has materially breached its obligations under Sections 2.1, 2.2, and 2.3 of the Custodial Agreements, by failing to properly perform its duty to review the mortgage notes in the GMAC Mortgage Securitizations' loan pools and by failing to notify MBIA of breaches of the representations and warranties in the GMAC Mortgage Securitizations' Mortgage Loan Purchase Agreements.

152. MBIA has been damaged and will continue to be damaged in an amount to be determined at trial as a result of the breaches of the Custodial Agreements by Ally Bank.

## RELIEF DEMANDED

WHEREFORE, plaintiff MBIA Insurance Corporation demands judgment against Defendants as follows:

153.   With respect to the First Cause of Action, a judgment (a) declaring that, as a result of Defendants' having aided and abetted the Securitization Sponsors' fraud, Defendants must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the Securitizations, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses, and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses and liabilities relate directly to specifically identified non-compliant mortgage loans; and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA and all future losses and liabilities that MBIA will incur, with respect to the Policies issued in connection with the Securitizations, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses, and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

154.   With respect to the Second Cause of Action, a judgment declaring that, as a result of defendant Ally Bank's breaches of its obligations under the Custodial Agreements for the GMAC Mortgage Securitizations, defendant Ally Bank must compensate MBIA for all losses and liabilities incurred by MBIA and all future losses and liabilities that MBIA will incur as a result of those breaches, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses, and any other fees and expenses that MBIA incurred or incurs,

DOCS-#3759278-v2

whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

155.    The full amount of MBIA's attorneys' fees and expenses with respect to this action; and

156.    For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

MBIA hereby demands a trial by jury on all issues triable by jury.

## ACKNOWLEDGMENT

The party upon whose behalf this pleading is submitted, by and through the undersigned, hereby acknowledges that sanctions may be imposed for a violation of Minn. Stat. § 549.211.

58

DATED: *17 Sept. 2012*

LINDQUIST & VENNUM P.L.L.P.

By

Wallace G. Hilke (175857)
Daniel N Sacco (0330723)
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

Of Counsel:

Peter E Calamari (*pro hac to be submitted*)
Marc L. Greenwald (*pro hac to be submitted*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Plaintiff MBIA*

59